COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS



| | | |
|---|---|---|
| THE STATE OF TEXAS, | § | No. 08-13-00119-CR |
| Appellant, | § | Appeal from the |
| v. | § | County Criminal Court at Law Number Two |
| | § | |
| JEFFREY GENDRON, | | of El Paso County, Texas |
| | § | |
| Appellee. | | (TC# 20130C00284) |
| | § | |

## **O P I N I O N**

The Fourth Amendment to the United States Constitution protects one in their home and person from unreasonable searches and seizure; while driving an automobile it protects one from being stopped unless the police can "point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant" the stop.[1]  In this case, Jeffrey Gendron, was pulled over and subsequently arrested for driving while intoxicated.  A breath sample taken after the stop revealed twice the legal limit.  Based on a motion to suppress that breath sample, the trial court granted his suppression motion, finding the stop to be illegal.  The stop, and what the police officer saw, is fully documented on the police cruiser's dash-cam video which is before us.  The State argues that based on that dash-cam footage, this Court can find

---

[1] *Terry v. Ohio,* 392 U.S. 1, 20, 88 S.Ct. 1868, 1880, 20 L.Ed.2d 889 (1968) ;U.S. Const. amend. IV.

that the stop was justified and overturn the trial court's ruling to the contrary. For the reasons noted below, we decline to do so.

## FACTUAL SUMMARY

Appellee was indicted for driving while intoxicated with a blood alcohol level over 0.15. TEX.PENAL CODE ANN. § 49.04(d)(West Supp. 2014).[2] The charge arose out of an arrest in the early morning of January 3, 2013. Officer Raul Melendez was patrolling Interstate 10's three west bound lanes near mile marker 28.[3] He drove up behind Appellee who was west bound in the middle lane. According to Officer Melendez's testimony at the suppression hearing, Appellee's vehicle was "swerving, at which time--it was in the middle lane, swerved from the middle lane to the inside, back, and then to the outside lane, at which time I conducted a traffic stop . . . ." He testified to following Appellee for about two miles. It was 2:40 a.m. in the morning.

On cross examination, Officer Melendez embellished that Appellee swerved out his lane "[a]pproximately five times." He then agreed that Appellee crossed the Interstate's white divider lane lines a total of five times. Appellee's attorney then played the police cruiser's dash-cam video. The video shows Officer Melendez's vehicle quickly moving through traffic. Appellee's vehicle is first visible in the middle lane at the time stamp 2:39:39 on the video. As Officer Melendez's cruiser comes up behind Appellee's pick-up truck, the truck is side by side with another vehicle which is in the far right hand lane. Appellee's truck can be seen drifting towards that vehicle, but it never leaves its lane. Appellee's truck then moves ahead of that other vehicle

---

[2] In a separately numbered cause, Appellee was also apparently charged with possession of a firearm while intoxicated. An inventory search of his car revealed a pistol stored in his glove compartment and Appellee has an conceal and carry permit. TEX.PENAL CODE ANN. § 46.035(d)(West Supp. 2014)("A license holder commits an offense if, while intoxicated, the license holder carries a handgun under the authority of Subchapter H, Chapter 411, Government Code, regardless of whether the handgun is concealed."). Appellee's suppression motion does not address that cause number and it is not before us.

[3] He was part of a DWI task force and had been on the police force for over seven years by time of this stop.

and only Appellee's truck is visible in the west bound lanes. His truck then drifts to the left and right but stays in its lane. At one point the passenger side wheels appear to get all the way onto to lane lines to his right. Officer Melendez's cruiser comes within a few car lengths of Appellee's truck. Appellee's truck then crosses over partially into the far left lane. His driver's side wheels completely cross over the white striped lines.

At that point, Officer Melendez's vehicle begins weaving over the lane lines. He testified that he did this with his back lights illuminated to alert traffic behind him that he was going to make a stop. The reflection of his front flashing lights becomes visible at the time stamp 2:40:51 on the video, making the total elapsed time between when Appellee's vehicle is first in view, until when he is signaled to pull over, one minute and twelve seconds. Officer Melendez acknowledged that Appellee promptly pulled over.[4]

After viewing the dash cam video, Office Melendez acknowledged that Appellee's vehicle only crossed the lane lines "once or twice," rather than the five times he originally testified to. He maintained that Appellee's weaving created a danger to other vehicles, but conceded that the traffic was light and there were no other vehicles next to Appellee's when it actually crossed the lane lines. At other points in his testimony, he agrees that other cars were not endangered by the movement of Appellee's vehicle.

Following the hearing, the trial court signed an order granting the motion to suppress. The trial court made oral findings of fact which were later reduced to an order. The relevant written findings include:

---

[4] The video goes on to show the administration of the field sobriety test, which Appellee failed. Appellee admitted to having had a cocktail at a night club. The officer testified at the hearing that Appellee had bloodshot eyes, smelled of alcohol, and had slurred speech. The breath sample allegedly tested at 0.19. We think it beyond dispute that once the officer interacted with Appellee following the stop, he had probable cause to further detain and then arrest Appellee for driving while intoxicated. The sole question before us is the justification for the initial stop.

3

FINDINGS OF FACT

.       .       .

2. The Court further finds that at or about 2:40 a.m., the officer testified that he observed a vehicle in front of him and testified that the vehicle was swerving at least five times from the middle lane, then into the inside lane, then to the outside lane and back into the middle lane for approximately two miles;

3. The Court further finds that the officer testified that the traffic activity was not heavy, that he turned his back lights on first to warn the other drivers behind him that the [sic] was making a traffic stop, and started to swerve himself in order to alert the other drivers to back off;

4. The Court further finds that the officer testified that the defendant was swerving from one lane to another and did place other vehicles in danger.

CONCLUSIONS OF LAW

1. The Court concludes that the defendant did not swerve five times from lane to lane, and only noticed a slight encroachment into the inside lane;

2. The Court finds that there was not heavy traffic and did not place other drivers in danger;

3. The Court further concludes that when the officer's overhead lights went on, the defendant immediately signaled to change lanes and proceeded safely toward his stop, without causing any danger to other drivers;

4. The Court further concludes that the dash cam video was in direct conflict with the police officer's testimony regarding how many times the defendant swerved into the lanes, and finds that his testimony is not credible and that there are no specific articulable facts for the officer to have reasonable suspicion or probable cause that the defendant was committing any criminal activity or that he was intoxicated.

**STANDARD OF REVIEW**

Appellant was stopped without a warrant and without his consent; accordingly, the State had the burden of proving the reasonableness of the stop. *See Castro v. State*, 227 S.W.3d 737, 741 (Tex.Crim.App. 2007); *Young v. State*, 133 S.W.3d 839, 841 (Tex.App.--El Paso 2004, no pet.). A peace officer's decision to stop an automobile passes Fourth Amendment scrutiny when the officer has a reasonable articulable suspicion that criminal activity may be afoot. *See Terry*

4

*v. Ohio*, 392 U.S. 1, 30, 88 S.Ct. 1868, 1884, 20 L.Ed.2d 889 (1968). Reasonable suspicion exists when, based on the totality of the circumstances, the officer has specific articulable facts which lead him to conclude that the person is, has been, or soon will be engaged in criminal activity. *Woods v. State*, 956 S.W.2d 33, 38 (Tex.Crim.App. 1997). An officer may lawfully stop and detain a person for a traffic violation that the officer witnesses. *See Garcia v. State,* 827 S.W.2d 937, 944 (Tex.Crim.App. 1992); TEX.CODE CRIM.PROC.ANN. art. 14.01(b)(West 2005)("A peace officer may arrest an offender without a warrant for any offense committed in his presence or within his view."); TEX.TRANSP.CODE ANN. § 543.001 (West 2013)("Any peace officer may arrest without warrant a person found committing a violation of this subtitle."). The decision to stop an automobile is reasonable when an officer has probable cause to believe that a traffic violation has occurred. *Whren v. United States,* 517 U.S. 806, 810, 116 S.Ct. 1769, 1772, 135 L.Ed.2d 89 (1996); *Walter v. State,* 28 S.W.3d 538, 542 (Tex.Crim.App. 2000).

We review a trial court's decision to grant or deny a motion to suppress for an abuse of discretion. *Montanez v. State*, 195 S.W.3d 101, 108 (Tex.Crim.App. 2006). An abuse of discretion occurs when the trial court's decision was so clearly wrong as to lie outside the zone of reasonable disagreement. *Cantu v. State,* 842 S.W.2d 667, 682 (Tex.Crim.App. 1992); *Montgomery v. State,* 810 S.W.2d 372, 391 (Tex.Crim.App. 1990)(op. on reh'g). As a general rule, appellate courts should afford almost total deference to a trial court's determination of the historical facts that the record supports, particularly when those fact findings are based on an evaluation of credibility and demeanor. *Guzman v. State,* 955 S.W.2d 85, 89 (Tex.Crim.App. 1997). "The winning side is afforded the 'strongest legitimate view of the evidence' as well as all reasonable inferences that can be derived from it." *State v. Duran*, 396 S.W.3d 563, 570 (Tex.Crim.App. 2013), *quoting State v. Weaver,* 349 S.W.3d 521, 525 (Tex.Crim.App. 2011).

5

We also afford the same amount of deference to a trial courts' rulings on the application of the law to the facts--so called mixed questions of law and fact--if resolution of those questions turns on an evaluation of credibility and demeanor. *Guzman*, 955 S.W.2d at 89. We may review *de novo* "mixed questions of law and fact" not falling within this category. *Id.*

The intersection of these standards of review with the advent of dash-cam video has proven a thorny issue. In *Carmouche v. State,* 10 S.W.3d 323 (Tex.Crim.App. 2000), the Court declined to give that "almost total deference" to a trial court's determination that a defendant voluntarily consented to a search when "the videotape present[ed] indisputable visual evidence contradicting essential portions of [the officer's] testimony." *Id*. at 332. But six years later in *Montanez v. State,* 195 S.W.3d 101, 109 (Tex.Crim.App. 2006), the Court of Criminal Appeals reiterated that even with a videotape, the trial court's determination of historical facts is entitled to almost total deference. *Id*.; *see also Carter v. State,* 309 S.W.3d 31, 40 (Tex.Crim.App. 2010)(applying deferential standard to trial court's review of video of interrogation); *Manzi v. State*, 88 S.W.3d 240, 241 (Tex.Crim.App. 2002)(applying deferential standard to trial court review of affidavits). *Montanez* expressly rejected the proposition that a video changes the deferential standard of review. *Id*. at 108-09. One rationale for that holding is that trial courts are vested with the function of determining historical facts; the fortuity of a video should not entitle the loser, whoever that may be, to a *de novo* review by three, or nine, more sets of eyes. Reading the cases together, we glean that the trial court's factual determinations are entitled to almost total deference so long as they are supported by the record, meaning that the video does not indisputably negate the trial court's findings. *See State v. Houghton,* 384 S.W.3d 441, 446 (Tex.App.--Fort Worth 2012, no pet.)(the reviewing court is to give almost total deference to the trier of fact's factual determinations unless the video recording indisputably contradicts those

6

findings).

**ANALYSIS**

The State brings one issue on appeal contending that the trial court abused its discretion in granting the motion to suppress based on an illegal traffic stop. According to the State, the officer had reasonable suspicion to pull Appellee over for suspicion of DWI based on his weaving in and out of his lane, the early morning hour that he was driving, and the officer's training and experience. Acknowledging the *Montanez* opinion, the State counters that: "In this case, however, the video-recording evidence is not subject to any interpretation, in that it shows that the appellee swerving within the lane and outside the lane, on the freeway, in the dark, early morning hours. No further interpretation of this indisputable visual evidence was necessary, or even possible."

Appellee responds in part that this was not a stop based on suspicion of DWI, but one based on a traffic offense, and merely crossing a stripped lane line is not an offense unless it endangers other drivers. Based on the trial court's finding that other drivers were not endangered, there could be no reasonable basis to stop and ticket Appellee for crossing a lane line. The State's brief conversely claims that "Off. Melendez did not stop the appellee for a violation of the traffic code, but for his swerving within the lane and outside of the lane, and the time of night." At the suppression hearing, however, the officer testified that the swerving constituted a traffic offense, and he never contended the stop was based on a suspicion of DWI. Ultimately, the officer's subjective intent at the time is not determinative. The Court of Criminal Appeals has held that a stop made for the wrong reason is still permissible, so long as the officer actually had before him facts which would have justified the stop for a good reason. *Duran*, 396 S.W.3d at 570. Accordingly, we analyze the stop both as one for a traffic offense, and one for

7

suspicion of DWI.

*Justifiying The Stop Based On A Traffic Offense*

"If an officer has a reasonable basis for suspecting that a person has committed a traffic offense, the officer may legally initiate a traffic stop." *Zervos v. State,* 15 S.W.3d 146, 151 (Tex.App.--Texarkana 2000, pet. ref'd). The State was not required to show that a traffic offense was actually committed, but only that the officer reasonably believed a violation had occurred. *Tex. Dep't of Pub. Safety v. Fisher,* 56 S.W.3d 159, 163 (Tex.App.--Dallas 2001, no pet.); *accord Garcia v. State,* 43 S.W.3d 527, 530 (Tex.Crim.App. 2001); *see also Cook v. State,* 63 S.W.3d 924, 929 n.5 (Tex.App.--Houston [14th Dist.] 2002, pet. ref'd)(noting that there is no requirement that a traffic regulation is actually violated).

Improperly crossing a lane is prohibited by TEX.TRANSP.CODE ANN. § 545.060(a)(West 2011). The provision requires a driver on a roadway with clearly marked lanes to "drive as nearly as practical entirely within a single lane" and "not move from the lane unless that movement can be made safely." *Id.* To prove one violates this provision, its text requires the State to show that a lane line encroachment creates an unsafe situation. In *Hernandez v. State,* a police officer stopped the defendant after observing him "drift" eighteen to twenty-four inches from the right lane into the adjacent left lane of traffic. 983 S.W.2d 867, 868-69 (Tex.App.-- Austin 1998, pet. ref'd). The court rejected the State's argument that the facts available to the officer gave rise to a reasonable suspicion that the defendant had violated Section 545.060(a). *Id.* at 870. The State failed to show that Hernandez's movements were unsafe or dangerous. *Id.* at 870-71. There were very few vehicles around, and Hernandez did not cause any problems for any of them. *Id.* at 868. The officer felt that the lane change was unsafe only because he was concerned about the driver's well-being. *Id.* But based only on the "drift" across the lane line, the court concluded "[w]e cannot turn a blind eye to common sense and experience. There are

8

myriad reasons why the wheels of a vehicle might drift slightly across a lane marker a single time." *Hernandez*, 983 S.W.2d at 870. The officer admitted that the lane change was the only reason for the stop.[5]

This same requirement of some evidence of danger to the driver or others has been accepted by other courts, and its absence has resulted in the ensuing stop being found improper. *Fowler v. State,* 266 S.W.3d 498, 499 (Tex.App.--Fort Worth 2008, pet. ref'd)(no reasonable suspicion to stop vehicle at 12:25 a.m. that drifted over lane line by one tire width once and touched the lane line two other times); *Eichler v. State,* 117 S.W.3d 897, 898 (Tex.App.--Houston [14th Dist.] 2003, no pet.)(holding no reasonable suspicion when car crossed lane line on interstate in light traffic at 12:30 a.m.); *Bass v. State,* 64 S.W.3d 646, 651 (Tex.App.--Texarkana 2001, pet. ref'd)(no reasonable suspicion to stop defendant who swerved within his lane line, and crossed it some unknown number of times over two to three mile stretch); *State v. Cerny,* 28 S.W.3d 796, 799 (Tex.App.--Corpus Christi 2000, no pet.)(holding no reasonable suspicion to stop defendant existed when car "just barely" swerved onto shoulder of lane of oncoming traffic, then crossed over shoulder line three to four times); *State v. Arriaga,* 5 S.W.3d 804, 807 (Tex.App.--San Antonio 1999, pet. ref'd)(van drifting toward center divider--but within lane--two to seven times near nightclub around 1:50 a.m.); *State v. Tarvin,* 972 S.W.2d 910, 912 (Tex.App.--Waco 1998, pet. ref'd)(holding no reasonable suspicion existed when car drifted over outside shoulder line two to three times at 2:00 a.m. near nightclub).

*Hernandez* is not without its critics. *See Cook*, 63 S.W.3d at 931 (Brister, C.J., concurring)("I believe it is time to stop distinguishing *Hernandez* and start disagreeing with it.").

---

[5] Hernandez was charged with DWI based on the clues the officer picked up after he made the stop. But importantly, the officer never testified the "drift" he observed lead him to believe that Hernandez was intoxicated. *Id.* at 870. For instance, the officer did not testify that, based on his experience, he subjectively suspected appellant of being intoxicated. *Id.* Nor did he testify that anything about the objective circumstances--time, location, and the vehicle's movement--would have led a reasonable officer to suspect the driver of being intoxicated.

This Court has in fact distinguished the *Hernandez* decision on any number of occasions, notably when there was other evidence in addition to the lane encroachment which justified a reasonable suspicion the driver was intoxicated or impaired. *State v. Five Thousand Five Hundred Dollars in U.S. Currency*, 296 S.W.3d 696, 703 (Tex.App.--El Paso 2009, no pet.)(agreeing that lane change without evidence of dangerousness was not justification for stop, but additional violation of driving on the shoulder violation supported stop); *Lara v. State*, No. 08-07-00350-CR, 2009 WL 4922473, at *5 (Tex.App.--El Paso Dec. 22, 2009, no pet.)(not designated for publication)(stop based on suspicion of DWI for lane violation and hitting curb when turning); *Rodriguez v. State*, No. 08-04-00083-CR, 2005 WL 1315003, at *4 (Tex.App.--El Paso June 2, 2005, no pet.)(not designated for publication)(lane changes without signaling and almost hitting a construction barrel supported reasonable suspicion of DWI); *Galindo v. State*, No. 08-03-00236-CR, 2004 WL 1903404, at *3 (Tex.App.--El Paso Aug. 26, 2004)(mem. op., not designated for publication)(driver who crossed lane line, was driving well below speed limit, and almost hit concrete abutment several times, created reasonable suspicion of DWI); *Waltmon v. State*, No. 08-03-00317-CR, 2004 WL 1801793, at *6 (Tex.App.--El Paso Aug. 12, 2004, pet. ref'd)(not designated for publication)(called in tip that driver was weaving "all over the road" confirmed by two officers who observed multiple unsignaled lane changes, pulled over for suspicion of DWI). But these kinds of distinguishing facts are absent here, and the State did not develop a record below that the kind of weaving we see on the video is necessarily indicative of impaired driving.

The trial court here explicitly made the finding that other vehicles were not endangered by Appellee. The trial court's finding of an absence of dangerousness is at least in part bound up in Officer Melendez's credibility and demeanor with respect to the other traffic that night. On

the video we can observe what was in front of Officer Melendez's vehicle because the dash-cam is pointed in that direction, but we have no view of what was to the rear of his car. Officer Melendez's testimony about the danger to other vehicles was clearly conflicting. At times he unambiguously states Appellee's vehicle was a danger to other vehicles, but at other junctures, he testifies to just the opposite.[6] The trial judge was there to see the officer on the stand. Abiding by *Guzman*'s teaching that we should give almost total deference to the trial court findings, there is no finding of dangerousness which is an element of the traffic offense under Section 545.060. We cannot say that a vehicle crossing a divided lane line on a single instance, and touching the lane once, when there are no other vehicles documented on the video, constitutes the kind of indisputable visual evidence of dangerousness which might justify overturning the trial court's application of disputed facts to the law.

*Justifying The Stop Based On Suspicion Of DWI*

The State primarily attempts to justify this stop based on the officer's suspicion of DWI. Appellee first responds that the officer claimed this was a stop based on a traffic offense, and that the State cannot rely on a justification never claimed by the officer. Nonetheless, if there was a correct basis for the stop of which the officer knew or could have known, the mere fact the officer subjectively believed the stop was justified for another reason will not render the stop illegal. *Whren*, 517 U.S. at 810, 116 S.Ct. at 1772; *Duran*, 396 S.W.3d at 570.

But if this was an investigatory stop for suspicion of DWI, the State is hampered by the trial court's finding that Officer Melendez lack credibility based on his embellishment of certain facts which are contradicted by the video. In other words, the State cannot ask us to rely on the officer's years of training and experience in interpreting the facts shown on the video when the trial court found the officer's testimony unreliable. The State is also hampered by the fact that

---

[6] Nor did the Officer claim he was pulling Appellee over as a danger to himself.

Officer Melendez never testified below that the kind of drift he observed in Appellee's driving is indicative of an impaired driver. We can indeed look at Appellee's vehicle drift back and forth within its lane, and cross the dividing lane line at least once, but the State's argument presupposes that we have the expertise to interpret the significance of those movements to the degree that we can say there was indisputable evidence contradicting the trial judge's finding. Stated otherwise, are Appellee's movements indicative of an impaired driver, or is this the normal reaction of a driver when a police cruiser speeds up and closely follows one in the early morning hours? The police officer, through his training and experience, could have easily answered those questions, but he did not.

The State relies heavily on this Court's opinion in *State v. Alderete*, 314 S.W.3d 469 (Tex.App.--El Paso 2010, pet ref'd), which reversed a trial court's finding that a traffic stop was improper. In that case, two officers had followed the defendant's car for a short time on the Interstate and noticed it weaving within its lane in the very early morning hours. *Id*. at 471. Unlike this case, the officers in *Alderete* both testified that based on their training and experience, weaving within a lane late at night is a sign of a potentially intoxicated driver. *Id*. And unlike this case, the trial court specifically found the officers in *Alderete* were credible. *Id.*

The trial court in *Aldrete* based its exclusion on the rationale that no traffic offense had been committed. But the majority in *Alderete* noted that "the officers initiated a traffic stop, not because she violated the traffic code, but because she was swerving within her lane at a late hour, which based on their experience, indicated that she was intoxicated." *Id*. at 471. *Alderete* presents the situation where the historical facts of the encounter are uncontested, and unmixed with credibility and demeanor disputes. Accordingly, the reviewing court decides *de novo* whether those undisputed facts create a reasonable suspicion for the stop. *Guzman*, 955 S.W.2d

at 89.  Here, however, we are faced with the converse situation here where the critical fact--the relative significance of Appellee's driving pattern--would come from a witness the trial court found to lack credibility.  Moreover, that witness never testified to the significance of Appellee's driving as a possible indicator of intoxication.  We decline, at least based on this particular video, to substitute ourselves in as surrogate experts on that question.  We overrule the sole point and affirm the ruling of the trial court.

February 11, 2015

ANN CRAWFORD McCLURE, Chief Justice

Before McClure, C.J., Rodriguez, and Hughes, JJ.

(Do Not Publish)